KELL et al. v. ROSS. (No. 8107.)†

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 20, 1915. Rehearing Denied March 27, 1915.)

1. APPEAL AND ERROR ⬅️215—INSTRUCTIONS —OBJECTIONS—REVIEW.

An instruction to which no objection was presented must, under the amended law, be deemed on appeal as·approved.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1309–1314; Dec. Dig. ⬅️ 215.]

2. APPEAL AND ERROR ⬅️1051—ERRONEOUS ADMISSION OF EVIDENCE.

Where witnesses, testifying without objection, proved the due execution of a will, error in admitting testimony of an attesting witness alleged to be·incompetent because the husband of a chief beneficiary as to the execution of the will was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. ⬅️ 1051.]

3. PROPERTY ⬅️9—TITLE—EVIDENCE—ADMISSIBILITY.

In a will contest on the grounds of mental incapacity and undue influence, testimony of witnesses that it was their understanding that a son was the purchaser and reputed owner of real estate described in the will, reciting that the same had been advanced to the son, was incompetent.

[Ed. Note.—For other cases, see Property, Dec. Dig. ⬅️9; Evidence, Cent. Dig. §§ 144, 474½, 1220, 2171.]

4. APPEAL AND ERROR ⬅️1057—HARMLESS ERROR — ERRONEOUS EXCLUSION OF EVIDENCE.

Error in excluding evidence to establish a fact established by evidence received without objection is harmless. ·

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4194–4199, 4205; Dec. Dig. ⬅️1057.]

5. WILLS ⬅️53, 164—CONTESTS—EVIDENCE— ADMISSIBILITY.

In a will contest by a disinherited son on the grounds of testamentary incapacity and undue influence exerted by another son, evidence that the latter son had unlawfully deprived contestant of property was inadmissible.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 111, 112, 120–130, 403–414; Dec. Dig. ⬅️53, 164.]

6. APPEAL AND ERROR ⬅️742 — QUESTIONS REVIEWABLE—REMARKS OF COURT.

Assignment of error that the court erred in making remarks tending to discredit a witness must be overruled where the statements under the assignment does not disclose the testimony of the witness.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3000; Dec. Dig. ⬅️742.]

---

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

**7. WILLS** ☞330—CONTESTS—EVIDENCE—INSTRUCTIONS.

Where, in proceedings to contest a will on the ground of mental incapacity, there was evidence that testator was mistaken as to having made advancements as recited in the will, and that before execution of the will he was cranky, but the attending physicians and the attorney drawing the will declared that he at the time of the making of the will, about two months before his death, was of sound and disposing mind, an instruction that testator, to possess mental capacity, must have had capacity to know and understand what he was doing and the effect of his act at the time he executed the will, sufficiently submitted the issue.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 779–781; Dec. Dig. ☞330.]

**8. TRIAL** ☞257—QUESTIONS REVIEWABLE—INSTRUCTIONS—REQUESTED INSTRUCTIONS.

Under Rev. St. 1911, art. 1971, as amended by Acts 33d Leg. c. 59, providing for the submission of the charge to the parties or their attorneys for inspection, and requiring the giving of the charge before the argument is begun, contemplates that special instructions shall be requested in such time as to enable the court to submit the same if given together with the main charge before commencement of argument.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 642–645; Dec. Dig. ☞257.]

**9. WILLS** ☞55—TESTAMENTARY CAPACITY—INSANE DELUSION—EVIDENCE.

That testator at the time of the execution of his will labored under the delusion of having made advancements recited in the will, when, in fact, he had made none, does not alone raise the issue of insane delusions.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. ☞55.]

Appeal from District Court, Hood County; W. J. Oxford, Judge.

Proceedings by J. B. Ross for the probate of the will of M. Kell, deceased, in which Mat L. Kell and another appeared as contestants. From a judgment admitting the will to probate, contestants appeal. Affirmed.

Estes & Estes, of Granbury, and Jas. C. Wilson and R. L. Stennis, both of Dallas, for appellants. W. D. Wilson, of Spur, W. L. Dean, of Granbury, and John J. Hiner, of Ft. Worth, for appellee.

CONNER, C. J. For a statement of the nature of this case we quote what was stated by Mr. Justice Dunklin on a former appeal (159 S. W. 119) viz.:

"J. B. Ross instituted this suit in the county court of Hood county to probate a certain instrument in writing purporting to be the last will and testament of M. Kell, deceased; Ross being named as independent executor of the will. Texanna Kell and Mrs. Christina Foreman, daughters of the deceased, were the principal beneficiaries of the will. Mat L. Kell and T. J. Kell, two of the sons of the deceased, contested the application for the probate of the instrument, but in the county court the contest was overruled, and the will duly admitted to probate. The contestants appealed the case to the district court of Hood county, in which court J. S. Kell, another son of the decedent, also appeared as a contestant, adopting the pleadings of the other two contestants.

"By the terms of the will two lots in the town of Granbury, apparently of little value, were devised to Henry C. Kell, another son of testator, but soon after the execution of the will testator executed to Henry C. Kell a bill of sale to a stock of horses and cattle.

"The tenth and eleventh paragraphs of the will are as follows:

"'Tenth. My deceased wife and myself having already advanced to my son Mat L. Kell, 160 acres of land known as the Bruington place in Hood county, Texas, by deed duly recorded in the deed records of said county, which land was valued at about the sum of eighteen hundred dollars ($1,800.00), and also having advanced to him two black mares of the value of one-hundred dollars, and also having advanced to him four hundred and fifty dollars in cash with which to assist him in making payments on lands purchased by him and owned by him in Hood county, Texas, all of which advancements were made to him out of the community estate of myself and deceased wife, M. C. Kell, it is therefore my will and desire that the said Mat L. Kell have no part or lot in the estate possessed by me at the time of my death, he having already received such portion thereof, and of his mother's estate, that I desire him to have.

"'Eleventh. I have already advanced to my son T. J. Kell, the sum of seven hundred and fifty dollars ($750.00) which he received from the sale of certain property in Floyd county, Texas, as an advancement to him out of his interest in his mother's estate, and have also advanced to him out of his interest in his mother's estate eight head of horses of the value of sixty-five dollars per head, which advancements are about equal to the interest he would be entitled to in his mother's estate; and it is my will and desire that he have no lot or part in my estate at the time of my death.'

"In the contest filed it was alleged that testator was 85 years of age at the time the will was executed; that, by reason of his extreme age and the impaired condition of his health, he was not possessed of sufficient mental capacity to make a valid will. As a further ground for the contest it was alleged that the facts recited in the two paragraphs of the will above quoted were false, and that the testator had been induced to believe that the same were true by fraudulent representations made to him by Henry C. Kell, and that by reason of such misrepresentations testator had been induced to exclude Mat L. Kell and T. J. Kell from shares in his estate. The pleading then continues with specific allegations that Mat L. Kell had purchased and paid for the 160 acres of land known as the 'Bruington place' and the two black mares mentioned in the tenth paragraph of the will, and, further, that testator had never at any time advanced to said Mat L. Kell the $450 mentioned in the same paragraph as an advancement, and that neither the money nor the horses mentioned in the eleventh paragraph of the will were ever, in fact, advanced to T. J. Kell."

On the former appeal the judgment, which was in favor of the present appellants, was reversed because the court had admitted over the objection of the proponent Ross the testimony of the contestant Mat L. Kell, to the effect that he (Mat L. Kell) had loaned his deceased father the sum of $485 some 20 years before the trial with which to assist the father in building his residence, and that the father had always agreed to repay to the witness said sum, and had recognized the justness of the claim. The objection was based upon article 3690 of the Revised Statutes of 1911, which in the present appeal is again invoked, and which, therefore, will be here set out. The article referred to reads:

."In actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed. to testify against the others as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

On the last trial the court submitted the cause upon the following special issues:

"Special issue No. 1: Were Dr. W. S. Walker and J. T. Foreman, on the 6th day of February, 1911, each credible persons? Answer this 'Yes' or 'No.'

"Special issue No. 2: Was M. Kell of sound mind at the time he executed the document dated February 6, 1911, purporting to be his last will? Answer this 'He was' or 'He was not.'

"Special Issue No. 3: At the time M. Kell executed the paper purporting to be his last will, dated February 6, 1911, was his mind either from sickness, disease, or mental decay, or, from overweaning confidence, subject to the domination and control of his son Henry C. Kell, or of any other of the beneficiaries named in contestants' answer? Answer this 'It was' or 'It was not.' "

The issues were accompanied by appropriate instructions, and the jury returned the following answers:

"To special issue No. 1 we answer: Yes.

"To special issue No. 2 we answer: He was.

"To special issue No. 3 we answer: It was not."

Judgment was accordingly rendered for the proponent, J. B. Ross, and the contestants have appealed.

It is objected that the court erred in permitting the witness J. T. Foreman to testify, not therefor having been called by the contestants, that the deceased testator, M. Kell, requested the witness to sign the will in question on the date of its execution. It appears that at the time of the execution of the will and of J. T. Foreman's signature thereto as a witness he (Foreman) was the husband of one of the daughters (Christina) of M. Kell, deceased, who was one of the principal legatees in the will. It further appears that after the execution of the will by M. Kell Christina Foreman died intestate and without children, and that later J. T. Foreman married Texanna Kell, the remaining daughter of M. Kell, deceased, also one of the principal devisees in the will, and that the relation of husband and wife existed between J. T. Foreman and Texanna Foreman at the date of the trial. It is insisted that the testimony objected to is in contravention of the article of the statute hereinbefore quoted; the contention being that Foreman, as heir of his first wife, and as the husband of a surviving devisee, was disqualified as a witness under the article. By another assignment for the same reasons objection is made to the further testimony of J. T. Foreman that a day or so prior to the execution of the will M. Kell, the testator, requested the witness to go after John J. Hiner, the attorney who later wrote the will in question.

[1] We have not found it necessary to decide the question of the witness Foreman's disqualification under the article of the statute referred to, for the reason that in any event the court's ruling, if available in behalf of appellants at all, was harmless. While in one of the paragraphs of the contestants' pleadings it was alleged that the will in question had not been executed under the formalities required by law (see R. S. 1911, art. 7857), there seems to have been no serious contention of this kind on the trial as a ground for setting the will aside. The court instructed the jury that:

"In the first place, then, you are instructed that the uncontradicted evidence in this case shows that the instrument dated February 6, 1911, purporting to be the last will and testament of M. Kell, deceased, is in writing; that it was read over to the said M. Kell; that thereafter the said M. Kell signed the same; that it was witnessed by Dr. W. S. Walker and J. T. Foreman; that said Walker and Foreman were each at said time above the age of 14 years, and that each of them subscribed their names to the instrument at the request of M. Kell, in his presence, and in the presence of each other; that M. Kell at said time was over the age of 21 years; that said instrument is the last paper executed by the said M. Kell which purports to be his will; that said M. Kell is dead; and that at the date of his death he resided in Hood county, Tex."·

No objection to the charge so given was presented, which, under the terms of our amended law, must therefore be regarded as approved. See Cleburne St. Ry. Co. v. Barnes, 168 S. W. 991; Stephenville, North & South Tex. Ry. Co. v. Wheat (No. 8015) 173 S. W. 974, by this court, not yet officially published.

[2] Moreover, Dr. W. S. Walker, one of the subscribing witnesses to the will, after identifying the signature of M. Kell to the instrument then exhibited to him, testified:

"I also identify the signatures of myself and J. T. Foreman to said instrument. I saw M. Kell affix his signature to that instrument [the will in question] on the 6th day of February, 1911. I also saw J. T. Foreman affix his signature to the same instrument on that same date. Mr. M. Kell asked Mr. J. T. Foreman and I to sign the instrument as witnesses in the presence of John Hiner. At the time this instrument was executed there were in the room John J. Hiner, myself, J. T. Foreman, one of the girls, and M. Kell."

John J. Hiner testified, among other things:

"On Sunday I told Mr. Kell that he would have to have two witnesses to his will. He said: 'Dr. Walker will be here Monday, and there will be somebody about the place that we can get for a witness.' So when I read the will over to him and asked him if it suited him, he said it did, and I called to Dr. Walker and Mr. Foreman to come in, because Mr. Kell said he wanted to use Dr. Walker and Mr. Foreman as witnesses to his will. ·I propped Mr. Kell up in bed either when I took the pencil memorandum in there or when I was reading the will to him; I don't remember which; but I propped him up with a chair, and when Dr. Walker and Mr. Foreman came in I took a book off the table and got the pen, and held the book on the old gentleman's knee, and he took

this will in his left hand, and with his right hand wrote his signature to the will in the presence of Dr. Walker and Mr. Foreman, and when he signed the will he turned to them and said, 'Gentlemen, this is my will, and I want you to witness it for me;' and they took the will over to the South window, and they signed the will in the presence of each other, and Mr. Kell was sitting up in bed close to them."

No objection has been presented to the testimony of Dr. Walker and Mr. Hiner above quoted, and yet another witness testified without objection that he heard M. Kell request Foreman to go after Mr. Hiner. It has been held in a long line of decisions in this state that a judgment will not be reversed because of the admission of illegal testimony where evidence of substantially the same effect has been admitted without objection. Appellants' first, second, and third assignments are accordingly overruled.

[3] In the tenth paragraph of the deceased's will, the testator, as a reason for excluding Mat L. Kell as a devisee, recites:

"My deceased wife and myself having already advanced to my son Mat L. Kell, 160 acres of land known as the Bruington place, in Hood county, Texas, by deed duly recorded in the deed records of said county, which land was valued at about the sum of eighteen hundred dollars ($1,800.00), and also having advanced to him two black mares of the value of one hundred dollars, and also having advanced to him four hundred and fifty dollars in cash with which to assist him in making payments on lands purchased by him and owned by him in Hood county, Texas."

And appellants in the fourth assignment insist that the court erred in excluding the testimony of the witness J. H. Bruington, to the effect that at the time he executed and delivered the deed conveying to M. Kell, deceased, said Bruington place, he understood the place to really belong to Mat L. Kell; the witness having already testified that he had contracted the place to Mat L. Kell, and that all negotiations had been conducted with him, but that at the last moment the deed had been made out and executed to M. Kell. By another assignment appellants also sought to show by Mrs. S. M. Eberhart that it was commonly reputed in the community of the Bruington place that it had been sold to Mat L. Kell. Mat L. Kell was permitted to testify without objection to the effect that he was in reality the purchaser of the Bruington place and paid therefor; that he later rented it without accounting to any one for the rents, and yet later sold the place, receiving the benefit of the purchase money, and to other facts in explanation of the transaction, and we can but approve the trial court's ruling in excluding the offered testimony. A mere "understanding" of the witness Bruington and the neighborhood repute that Mat L. Kell was the owner, rather than M. Kell, deceased, at the time of the original purchase of the Bruington place, was clearly incompetent. Appellants' fourth and fifth assignments are, accordingly, overruled.

[4] The substance of the conversation over the telephone between a daughter of M. Kell and C. E. Lockley, excluded by the court, and to which error has been assigned, was repeated in the testimony of C. E. Lockley before the jury, which therefore, in any view of the matter, renders the exclusion of the conversation entirely harmless. Appellants' sixth assignment is accordingly overruled. All of the testimony of Mat L. Kell recited in appellants' seventh assignment of error which is available to appellants under their bill of exception was properly excluded by the court under our ruling made on the former appeal.

[5] Among other things, appellants alleged that Henry C. Kell, a son of the testator, and one of the devisees, had unduly influenced his father to make the will as he did, and they sought to show by the witness Tom J. Kell, one of the contestants, that at a time designated in the testimony Henry C. Kell had unlawfully sold and disposed of at least 25 head of horses belonging to Mat L. Kell, one of the contestants who had been disinherited under the will, and that on another occasion Henry C. Kell sought by devious ways to deprive Mat L. Kell of a certain number of other young horses, and appellants in their eighth and ninth assignments of error complain of the action of the court in excluding the testimony referred to. In appellants' statement under these assignments no conversation or act of Henry C. Kell having a direct connection with the deceased testator is pointed out which tends to show that Henry C. Kell influenced, or attempted to influence, the disposition of M. Kell's property as made in the will, and we are of the opinion that the circumstances sought to be shown by Tom J. Kell and excluded by the court merely tend to show that Henry C. Kell committed crimes against his brother Mat L. Kell which are wholly collateral to the issues in this case. It is not shown in appellants' statement referred to that Henry C. Kell at any time manifested ill will or malice toward his brother Mat L. Kell, and the proof offered in its nature could go no farther than to show that Henry C. Kell was of a moral nature entirely consistent with the charge of undue influence made against him. We do not understand that a charge of fraud can be established by proof of other distinct frauds committed at other and different times. The court's ruling is accordingly approved, and the eighth and ninth assignments of error overruled.

[6] In the tenth assignment complaint is made of certain remarks of the court tending, as is charged, to discredit appellants' witness P. L. Townes. An examination of the bill of exceptions fails to disclose that the precise remarks to which the assignment relates were, in fact, made. Moreover, in the statement under the assignment the testimony given by the witness before the jury is not set out or disclosed, so that we might

determine whether the court's remarks had or could have any prejudicial effect. We must, therefore, overrule the assignment.

[7, 8] The court gave the following charge, among others:

"The term 'sound mind,' as used in special issue No. 2, means that the said M. Kell at the time of the execution of said instrument had the capacity to know and understand what he was doing and the effect of his act at the time he executed said instrument."

To the definition of the term "sound mind" so given appellants duly objected, because, as asserted, it failed to include the requirements that the testator must have had sufficient capacity "to know the extent of his property and to know the natural objects of his bounty and the claims of the natural objects of his bounty." In the effort to correct the defect claimed, appellants requested the submission of the following special instruction, which was refused:

"By 'sound mind' is meant the ability to understand the business in which one is engaged, the effect of his acts, the capacity to know the objects of his bounty and their claims upon him, and the extent of his property."

Error is assigned to the rulings indicated. As we think, amended article 1971 (Gen. Laws 1913, p. 113), relating to requests for special instructions, contemplates that such special instructions shall be requested in such time as to enable the court to submit the same, if given, together with the main charge before the argument of counsel begins, to the end that counsel, in addressing the jury, may know the precise issues upon which the case is submitted, and it may well be doubted whether appellants' objection to the court's refusal to give the special charge above quoted is available to them for the reason that, as shown by the court's explanation to the bill of exception, the special charge was presented more than two hours after the main charge had been read to the jury, and while counsel for appellants was closing the argument in their behalf. It was then too late without again opening the argument for appellee's counsel to discuss or answer the enlarged definition of "sound mind," as presented in the special charge. But, however this may be, we think, under the circumstances of this case, the definition given by the court was sufficiently comprehensive and correct to avoid any necessity of reversing the judgment below because of a failure to specifically include the element of knowledge of the natural objects of his bounty and their claims upon him. There is evidence which admits of the conclusions that the testator was mistaken as to having made certain advancements as recited in his will, and also as tending to show that the testator, before the execution of the will, was, as expressed by one of the witnesses, "cranky"; yet, on the whole, almost every witness who testified, including his attorney, John J. Hiner, who had acted for him in legal mat-

ters for years, and the physicians who waited upon him, declared that the testator at the time of the execution of his will, some two months prior to his death, was of sound and disposing mind. As illustrating this, the proof shows that the will in question was executed on the 6th day of February, 1911. Dr. J. R. Lancaster testified that he knew M. Kell intimately during his lifetime up to about the 1st of January, 1911, upon which last date he had a conversation with him, and that:

"His (M. Kell's) mental condition at that time was as good as it ever was as far as I knew. * * * I never did observe any senile dementia in M. Kell. * * * He was an eccentric man, and a man of his own ideas, hard to change about anything, and I used to joke him a good deal. * * * I practiced for him a good many years. When I talked with him here at the bank, as stated, his mind was sound and all right in every way, so far as I knew."

Mr. Hiner, among other things, testified:

"I had known Mr. Kell ever since I was a barefooted kid. I expect I have known him to remember him 30 years, and for the last 10 or 15 years I have represented Mr. Kell in his little business as his attorney whenever he needed me. In my relations with M. Kell as his attorney and in my long acquaintance with him I had opportunity of observing his mental condition prior to the 6th day of February, 1911, and on that date. I had occasion while discussing the terms and provisions of his will with him to observe his mental condition, and I did observe it, and he was of just as sound mind at that time as he had ever been in the 30 years that I had known him."

Dr. W. S. Walker, the family physician of the deceased, and who attended him in his last sickness, and who attested the will as one of the subscribing witnesses, after testifying to the length of his acquaintance and his opportunity of observing the mental condition of M. Kell at the date the will was executed, said:

"I had not seen any difference in the condition of his mind at that time (when the will was executed) from what it had been in 15 years. He was in his right mind. As far as I was able to detect, he was like he had always been since I had known him. I didn't see any difference. I had never observed any evidences of insanity in M. Kell during the time I knew him. At least it had not developed when I was around him."

Neither the evidence quoted in illustration, nor any other that has been pointed out to us, indicates that his possible forgetfulness in the matter of the advances, or his eccentricities, renders it probable that the testator at the time of the making of the will failed to have a knowledge of the objects of his bounty and of their claims upon him. By the court's definition the jury were instructed that his mental capacity must be such as that he knew "the extent of his property" and "the natural objects of his bounty and the claims of the natural objects of his bounty." The difference, if any, in the legal effect of the definition as given and that as requested is, as it seems to us, shadowy indeed, and we cannot think that, in any view

of the subject, we would be justified in reversing the judgment because of the complaint now under consideration. Indeed, we think the definition of "sound mind" as given by the court is substantially correct, or at least, as before indicated, there is nothing in the circumstances in this case rendering it misleading or prejudicially deficient. See 40 Cyc. 1004, par. "c"; Brown v. Mitchell, 75 Tex. 17, 12 S. W. 807; Allday v. Cage, 148 S. W. 838; Warren v. Ellis, 137 S. W. 1182. Appellants' eleventh and twelfth assignments of error are, accordingly, overruled.

[9] Complaint is made in appellants' thirteenth assignment of error of the court's failure to submit to the jury the issue of an insane delusion, and in the fourteenth assignment the court's action in refusing appellants' special request for the submission of that issue is also complained of. The only evidence referred to by appellants as tending to show that the testator was possessed of an insane delusion at the time of the execution of his will is the fact, as they contend, that he was laboring under the delusion of having made the advancements recited in the will, when the fact was otherwise. We do not understand that a mere mistake of fact of the kind indicated is sufficient to raise the issue of an insane delusion. It is said in 40 Cyc., beginning on page 1013:

"An insane delusion is a belief which has no basis in reason, and which cannot be dispelled by argument. A mistaken belief as to a matter of fact or illogical conclusion therefrom is not necessarily an insane delusion; neither is any belief or prejudice, however mistaken, which has some basis for it, as where those against whom the testator has a prejudice have sided against him in his quarrels, or have been lacking in interest or sympathy toward him when in trouble. One may have a delusion which does not imply or show unsoundness of mind, and even mistaken unnatural prejudice may not be an insane delusion, all persons being subject to likes and dislikes; and, to prove an insane delusion, it must appear that there was no basis for it, and that attempts were made by reasoning to dispel it."

See, also, In re Bartels' Estate, 164 S. W. 859. In the case before us, while Mat L. Kell and T. J. Kell denied that advancements had been made to them as recited in the will, yet there was testimony tending to contradict them by witnesses offered in behalf of appellee, and there is no evidence tending to show that the deceased, after effort made to correct him, doggedly maintained the mistaken belief indicated, if he was mistaken. We therefore overrule appellants' thirteenth and fourteenth assignments of error.

We fail to find any evidence sufficient to raise the issue of fraud, and, consequently, overrule assignments 15 and 16, complaining of the court's action in refusing to submit that issue. The remaining assignment of error complains of the insufficiency of the evidence to support the verdict; but we think we have already recited enough of the evidence to show that the complaint cannot be maintained.

All assignments of error are accordingly overruled, and the judgment affirmed.